## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| KATHY L. HARRISON,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:20-cv-02580<br><br>DISTRICT JUDGE JAMES R. KNEPP II<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Kathy L. Harrison ("Plaintiff" or "Ms. Harrison") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

On May 8, 2018, Ms. Harrison filed an application for supplemental security income. (Tr. 15, 66, 184-90.)[1]  Ms. Harrison alleged an onset date of September 19, 2007. (Tr. 15, 184), and asserted that she was disabled due to arthritis and mental health problems.  (Tr. 66-67, 90, 97, 228.)  Her application was denied at the initial level (Tr. 90-92) and upon reconsideration (Tr. 97-101).  She then requested a hearing.  (Tr. 102-04.)  On February 18, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 35-65.)

---

[1] Because the caption for the Administrative Record Certification lists an incorrect case number and District (ECF Doc. 13 p. 1), the Commissioner has been separately instructed to file a corrected Certification.  (ECF Doc. 17.)

On March 3, 2020, the ALJ issued an unfavorable decision, finding Ms. Harrison had not been under a disability within the meaning of the Social Security Act since May 8, 2018, the date the application was filed.  (Tr. 12-34.)  The ALJ denied an implied request to reopen a prior application, but noted that she considered "[e]vidence relating to the previously adjudicated time period . . . only to the extent it reflects on the claimant's functioning and entitlement to benefits during the relevant time period."  (Tr. 15-16.)  Ms. Harrison requested review of the decision by the Appeals Council. (Tr. 181-83.)  On September 15, 2020, the Appeals Council denied Ms. Harrison's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. Evidence

Although Ms. Harrison has severe physical impairments that were identified by the ALJ (*see* Tr. 18), her challenge in this appeal relates to the ALJ's evaluation of the opinion of the psychological consultative examiner and licensed psychologist Dr. Christopher C. Ward, Ph.D. (ECF Doc. 14 pp. 8-14).  The evidence summarized herein is accordingly focused on evidence pertaining to her mental health impairments and related limitations.

### A.    Personal, Educational, and Vocational Evidence

Ms. Harrison was born in 1970 and was 47 years old on the date her application was filed and 49 years old at the time of her February 2020 hearing.  (Tr. 28, 42.)  She was single and lived with one of her six adult children and a grandson.  (Tr. 43.)  She completed school through the eighth grade and last worked in 2001.  (Tr. 44, 45.)

**B.** **Medical Evidence**

**1.** **Treatment History**

Treatment notes from a September 22, 2009 prenatal visit with the OSU Family Practice at Rardin ("OSU") reflect a history of bipolar disorder and PTSD for which Ms. Harrison was taking several psychotropic medications. (Tr. 429-31.) During that visit, Ms. Harrison reported being nervous and anxious, but she felt her psychiatric symptoms were improving on her medications. (Tr. 429.)

At an office visit with family practitioner Dr. Chris Smallwood, M.D. on September 19, 2014, Dr. Smallwood noted that Ms. Harrison "previously had a psychiatrist who was managing her multiple mental health conditions," but that she had "not seen anybody in 2 years since her previous psychiatrist died." (Tr. 406.) On examination, she was alert and oriented, and appropriately responded to questions. (Tr. 407.) Her diagnoses included depression / bipolar disorder, and Dr. Smallwood noted that she expressed some depressive symptoms of hopelessness, loss of concentration, and increased sleep, but was not interested in resuming psychiatric care. (Tr. 408.) She indicated that she would think about resuming care at some date in the future. (*Id.*) She returned to see Dr. Smallwood on October 3, 2014, reporting continued depression and mood fluctuation, but no suicidal or homicidal ideation. (Tr. 402.) She remained alert and oriented, and appropriately responded to questions. (Tr. 403.) She was diagnosed with bipolar disorder and referred to psychiatry with Dr. Ortiz-Cruzado. (*Id.*)

The undersigned is unaware of records indicating whether Ms. Harrison followed up with Dr. Ortiz-Cruzado in 2014. It is noted that her office visit notes with family practitioner Dr. Amy Simpson, D.O. on November 10, 2016 reflect no psychiatric/behavioral complaints, normal mood and affect on examination, and no diagnosis for any mental health impairment. (Tr. 391-

93.)  The same is true of her office visit notes with Dr. Simpson on April 20, 2017, except that Dr. Simpson did note that she "used to get SSI for bipolar disorder."  (Tr. 385-87.)

On September 19, 2017, Ms. Harrison underwent a diagnostic assessment at Westwood Behavioral Health Center, Inc. ("Westwood") with Nicole Byrum, LIMFT and supervisor M. Shepherd Spieles, LISW-S.  (Tr. 312-28.)  She reported moving from Columbus after becoming homeless.  (Tr. 315.)  She and her children were living with a friend, and she was seeking care at Westwood because she was interested in getting back on SSI.  (*Id*.)  She reported being cut-off from SSI in September 2016 after receiving a life insurance policy from her mother.  (Tr. 316.)  She was interested in seeing a psychiatrist and counselor.  (Tr. 315.)

In her assessment, Ms. Harrison reported past diagnoses of bipolar disorder and PTSD, saying she saw a psychiatrist for thirteen years, until 2010.  (Tr. 315, 322-23.)  She said her prior medications were sometimes effective and sometimes ineffective.  (Tr. 323.)  She complained of seeing things that were not there, nightmares, and difficulty with sleep.  (Tr. 315.)  She also reported regular thoughts of suicide and a prior attempt, but said "I would never devastate my children that way."  (Tr. 323.)  She reported a history of abuse and a remote legal history "for fighting," but had not been in jail since 1995.  (Tr. 316-17.)  On examination, she was cooperative and calm with an appropriate affect, normal mood, speech, and thought content, intact thought processes and memory, orientation to time, place, person, and space, and average intelligence, but minimal insight.  (Tr. 324.)

Ms. Harrison attended an individual therapy session with Nicole Byrum, LIMFT on October 9, 2017.  (Tr. 449.)  She presented as "open and talkative" and "in fair spirits but … tearful as she talked about recent events involving her daughter."  (*Id*.)  On examination, she was alert, attentive, dressed appropriately, open and cooperative, and oriented to person, time, and

place.  (*Id.*)  She demonstrated appropriate eye contact, normal speech, euthymic mood, appropriate affect, intact memory and thought processes, good insight and judgment, and no evidence of delusions, paranoia, suicidal/homicidal ideation, or perceptual disorder.  (*Id.*)  Continued treatment was recommended.  (*Id.*)  Ms. Harrison did not attend scheduled therapy sessions on December 7, 2017 or January 12, 2018.  (Tr. 450.)

She returned to therapy on February 2, 2018, this time with Glenn Ashlen, CT.  (Tr. 451.)  She was "in good spirits and open throughout the session," but "report[ed] some 'awful dreams' and not being able to sleep."  (Tr. 451.)  Mental examination findings were the same.  (Tr. 451, 449.)  Therapist Ashlen identified relaxation techniques to help her when waking up from a bad dream, reminded her of her need to establish with primary care and obtain a physical "to begin process of seeing Dr. Bruno."  (Tr. 451.)  She noted that her children caused her stress, but that she loved them very much.  (*Id.*)  She denied homicidal or suicidal thoughts, plan, or intent, stating "I love my children too much to do that."  (*Id.*)

On February 26, 2018, Ms. Harrison attended a therapy session with Therapist Byrum.  (Tr. 452.)  She was "in fair spirits and was talkative and open."  (*Id.*)  She discussed past trauma and a current stressor involving her son.  (*Id.*)  Mental status examination findings were unchanged.  (Tr. 449, 451, 452.)  She complained of "nightmares and dark thoughts."  (Tr. 452.)  She also reported "hearing voices at times and seeing 'ghosts,'" but said it had "been going on since she was a child" and "seeing things [did] not disturb her."  (*Id.*)  She was receptive to scheduling an appointment with a primary care physician.  (*Id.*)

On March 19, 2018, Ms. Harrison saw Certified Nurse Practitioner Brittany Mawer at Family Healthcare of Northwest Ohio ("FHCNO") to establish care.  (Tr. 344-51.)  She reported an interest in starting medication for bipolar disorder, explaining that she had not yet been able to

see a psychiatrist at Westwood and "was told it would be several months."  (Tr. 344.)  On review

of systems, she reported anxiety, depression, hallucination, insomnia, mood changes, suicidal

ideation, and visual and auditory hallucinations since she was a child.  (Tr. 345.)  She denied

suicidal plan and was agreeable to seeing psychologist Dr. Cody Cramer.  (Tr. 345-46.)  On

examination, her mood and affect were depressed and labile.  (Tr. 346.)  She was diagnosed with

schizoaffective disorder, bipolar type, started on Depakene and Gedeon, and referred to Dr.

Cramer.  (Tr. 346-47.)

Ms. Harrison saw Dr. Cramer the same day to establish care.  (Tr. 342.)  She reported that

she had not seen psychiatry or taken behavioral health medications for several years, and wanted

to restart medications.  (*Id.*)  She used to take Depakote, and reported that "it worked well

enough for her to keep a steady job years ago."  (*Id.*)  She was seeing a counselor and case

manager at Westwood.  (*Id.*) On examination, she was able to articulate well with normal speech

and thought content, was able to complete basic computations and apply abstract reasoning, and

her associations were intact.  (*Id.*)  Her mood was anxious, depressed, labile, and tearful, her

judgment was questionable, and her thought processes and cognitive function were pressured.

(*Id.*)  She reported "garbled" auditory command hallucinations most days, with occasional

hallucinations that were more clear and told her to hurt herself, but denied acting on the

command.  (*Id.*)  She also reported thinking about hurting herself almost every day, with two

suicide attempts "decades before," but denied any plan or intent to take her life because of how it

would affect her children.  (*Id.*)  She also reported pulling her hair out and hitting herself, but

denied burning and cutting.  (*Id.*)  Dr. Cramer encouraged Ms. Harrison to be evaluated at the

Crisis Center, but she declined, stating she did not want to leave her kids alone.  (Tr. 343.)  Dr.

Cramer emphasized that her symptoms warranted a higher level of care, and noted that he was

just bridging care with behavioral health medications until Ms. Harrison could see psychiatry at Westwood.  (*Id.*)  He strongly encouraged her to continue counseling and case management at Westwood.  (*Id.*)

At therapy on March 20, 2018, Ms. Harrison reported having a hard time with one of her sons, and was tearful and frustrated with his actions, but was in "fair spirits" and her mental status examination findings were unchanged.  (Tr. 453.)  She was receptive to suggestions regarding how to handle her son's behavior.  (*Id*.)  She reported being back on medications.  (*Id*.)

Ms. Harrison followed up with CNP Mawer and Dr. Cramer on March 26, 2018.  (Tr. 339-40.)  She reported that her mood was "greatly improved," and denied suicidal thoughts since starting her medications.  (Tr. 339.)  She also reported sleeping better at night and having more energy and motivation during the day.  (*Id*.)   On examination, her anxiety, depression, and lability were improved, but she was still reporting hallucinations.  (*Id*.)  Her medications were continued, and she was encouraged to increase positive coping and social supports.  (Tr. 339-40.)

At therapy on April 10, 2018, Ms. Harrison was in fair spirits and feeling better mentally since starting her medications, but was stressed about finances.  (Tr. 454.)  Mental examination findings were normal.  (*Id*.)  She was "talkative and open but expressed frustration with not having a case worker yet and delaying the process of regaining her SSI."  (*Id*.)

Ms. Harrison met with case manager Kaitlin Hallfeldt, QMHS/CMS at Westwood on April 18, 2018.  (Tr. 455.)  She was in good spirits and reported being compliant with her medications.  (*Id*.)  She discussed her children and requested help with her application for SSI. (*Id*.)  At another case management visit on April 27, 2018, Ms. Harrison was in good spirts but reported difficulties with her children, including her son's violent behavior.  (Tr. 456.)  She denied thoughts of harming herself and others.  (*Id*.)

At therapy on May 1, 2018, Ms. Harrison was again in good spirits and reported doing well, but noted she had to press charges against her son for domestic violence.  (Tr. 457.)  She was "talkative and expressive" during the therapy session and her mental status examination findings were normal.  (*Id*.)  She expressed frustration regarding her son, but reported that her relationship with her daughters sustained her and helped her stay calm.  (*Id*.)

At case management on May 2, 2018, Ms. Harrison expressed her frustration with her son's behaviors, but denied thoughts of hurting herself or others.  (Tr. 458.)  She received assistance regarding her SSI application.  (*Id*.)  At case management on May 16, 2018, Ms. Harrison was in good spirits, reported medication compliance, and denied thoughts of harming herself or others.  (Tr. 459.)  She continued to receive assistance with her SSI paperwork.  (*Id*.)  She missed her therapy and case management appointments on May 23 and 24. (Tr. 460.)

At case management on June 4, 2018, Ms. Harrison was in a fair mood, and denied thoughts of hurting herself or others.  (Tr. 461.)  She continued to receive assistance with her SSI paperwork.  (*Id*.)  At case management on June 13, 2018, Ms. Harrison was in good spirits but reported she had not been taking her medications because she ran out.  (Tr. 462.)  She reported an appointment with her doctor and acknowledged she needed to take her medications, stating "otherwise I will go crazy!"  (*Id*.)  She continued to receive assistance regarding SSI.  (*Id*.)

At a behavioral health visit on June 19, 2018, Ms. Harrison reported she was unable to get refills for a period of time due to insurance issues, but was now back on her medication.  (Tr. 334.)  She reported having stable symptoms when she regularly took her medication.  (*Id*.)  On examination, she was oriented x3 with appropriate mood and affect, normal speech and thought content, intact associations, normal judgment and insight, and no thoughts of harming herself or

others.  (*Id.*)  While she still reported seeing "shadows" at times, she indicated it was manageable when taking Gedeon.  (*Id.*)  Her diagnosis and medications remained the same.  (Tr. 334, 336.)

At case management on June 20, 2018, Ms. Harrison was in good spirits and planned to pick up her medication refills soon.  (Tr. 463.)  She reported she did not have many stressors because her son was going to be in Columbus in July.  (*Id.*)  At case management on June 27, 2018, she was in good spirits, reported that was compliant with her medications, and denied thoughts of hurting herself or others.  (Tr. 464.)  She discussed family and household stressors, and reported both she and her daughter were denied SSI.  (*Id.*)

At case management on August 1, 2018, Ms. Harrison was in good spirits, denied having thoughts of hurting herself or anyone else, and reported medication compliance, but reported having gotten into an argument with her daughter and hit her.  (Tr. 470.)  She expressed remorse and was encouraged to "walk away and listen to music to help [herself] calm down so she won't get physical."  (*Id.*)  At case management on August 7, 2018, she reported being worried about her son's legal matters but was in good spirits, reported that she was compliant with her medications, and denied thoughts of hurting herself or others.  (Tr. 471.)

At therapy on August 8, 2018, Ms. Harrison was in good spirits but reported she was worried about her son.  (Tr. 472.)  Mental status examination findings were normal.  (*Id.*)  She reported that she was still interested in seeing a psychiatrist and reported being compliant with her medications.  (*Id.*)  She did not appear for her scheduled therapy appointment on August 20, 2018.  (Tr. 473.)  She returned to therapy on September 6, 2018, where she was in "fair spirits and was talkative and upbeat" but discussed a recent altercation with her daughter.  (Tr. 474.)  Mental status examination findings were normal.  (*Id.*)

On October 11, 2018, Ms. Harrison met with Nicole Kuntz, a new case manager at Westwood, accompanied by one of her daughters.  (Tr. 477.)  She reported she was not sleeping well, and her main goal was to obtain SSI.  (*Id*.)  Three of her daughters and one grandson were living with her, and she was more relaxed since her son moved out.  (*Id*.)  She reported being back on her medications but was not certain as to what her medications were.  (*Id*.)   Thereafter, she did not appear for scheduled therapy sessions in October or a scheduled case management visit in January 2019, and her services at Westwood were ultimately terminated. (Tr. 478-82.)

At a behavioral health visit with Dr. Cramer on April 9, 2019, Ms. Harrison reported worsening symptoms since she and her family had been homeless for the past two months, first sleeping in her van and later in hotels.  (Tr. 503.)  She was taking her medications, but did not think the Gedeon was strong enough because she was having increased auditory hallucinations over the past two months.  (Tr. 503.)  On examination, her speech and thought content were normal and her associations were intact.  (*Id*.)  She was anxious, depressed, and tearful, and her judgment and insight were questionable.  (*Id*.)  She denied hearing command hallucinations and explained that her auditory hallucinations appeared randomly.  (*Id*.)  She usually heard her children's voices, but when she asked them about it, they would tell her they were not talking to her. (*Id*.)  She reported wishing she was dead so she would not have to deal with the stress she was experiencing, but denied suicidal thoughts, plan, intent, and means.  (*Id*.)  She was surprised by the encouraging words she received after reaching out to friends on social media about her depressive thoughts.  (*Id*.)  Dr. Cramer referred her to a care manager for assistance regarding housing options, discussed adjusting her Gedeon dosing, and encouraged her to resume counseling once she addressed her basic housing needs.  (Tr. 504.)

Ms. Harrison returned to see Dr. Cramer on May 7, 2019, where she reported accidentally leaving her medications in a hotel room three weeks earlier, and having been off her medications since. (Tr. 494.) She had just refilled her medications and planned to restart taking them. (*Id.*) She reported worsening hallucinations since being off her medications. (*Id.*) She indicated that she and her children were living in a van, but she was hopeful that an apartment would become available soon. (*Id.*) On examination, she had normal speech and thought content, intact associations, labile mood and affect, and questionable judgment and insight. (*Id.*) She reported auditory, visual, and tactile hallucinations, but had no thoughts of self-harm or harming others. (*Id.*) Her diagnosis remained the same. (*Id.*) Dr. Cramer reinforced with Ms. Harrison that she had reported symptom improvement when on medication and worsening symptoms when not taking medication. (*Id.*) He discussed with her the need to reevaluate her symptoms once her housing was more stable. (*Id.*)

On August 20, 2019, Ms. Harrison returned to Westwood seeking to reengage services, saying she was interested in a psychiatric referral. (Tr. 619.) The undersigned is unaware of further records from Westwood after this date.

During a primary care visit with CNP Mawer on September 9, 2019, Ms. Harrison said she was doing okay with her medications, and reported that she still heard voices and saw shadows, but it "has improved and is manageable." (Tr. 612.) She was not interested in increasing her medication due to a possible increase in drowsiness. (*Id.*) On examination, her speech and thought content were normal and her associations were intact, her mood and affect were anxious and depressed, her judgment and insight were questionable, and there was no evidence of hallucinations, delusions, obsessions, or suicidal/homicidal ideation. (Tr. 613.) Her

medications were continued. (Tr. 614.) On September 16, 2019, her Depakene was switched to Depakote. (Tr. 611.)

She returned for a primary care visit with CNP Mawer on November 22, 2019, reporting she had been out of Depakote for two weeks and needed a refill. (Tr. 608.) She complained of feeling more manic since being off her medication, but felt her medications were working well for her overall, even though she had some mild hallucinations at times. (*Id*.) She reported that she had recently been sleeping okay. (*Id*.) She expressed interest in getting established with a tele-psychiatrist. (*Id*.) Mental status examination findings were generally unchanged from the prior visit. (Tr. 609, 613.) Her medications were continued, and it was recommended that she establish with the practice's tele-psychiatrist. (Tr. 609-10.)

### 2.  Opinion Evidence

#### a.  State Agency Reviewing Medical Consultants

On initial review, on July 25, 2018, state agency reviewing medical consultant Kristen Haskins, Psy. D. found that there was insufficient evidence to evaluate the claim, noting that Ms. Harrison had not responded to ADL form, calls, or letters. (Tr. 70-71.)

At the reconsideration level, on December 15, 2018, state agency reviewing medical consultant Karla Delcour, Ph.D. also found that the evidence was insufficient to evaluate the claim, noting that Ms. Harrison did not attend a consultative evaluation and did respond to attempts to reach her by phone and mail. (Tr. 81-82.)

#### b.  Psychological Consultative Examiner

On August 20, 2019, Ms. Harrison saw Christopher C. Ward, Ph.D. Licensed Psychologist for a consultative psychological evaluation (Tr. 519-24) and Dr. Ward also

completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on

August 27, 2019 ("MSS") (Tr. 515-17.)

### i.      August 20, 2019 Consultative Examination

When Dr. Ward asked Ms. Harrison about the nature of her difficulties, she stated:

> I hear voices, like I said.  I think people are talking about me.  I've had problems
> on COTA busses.  I slapped a woman once.  I got kicked off.  I hear things that
> aren't real.  Like I'll hear my daughter call my name like "mom come here a
> minute" and I feel things, I'll lay down to go to bed.  I see bugs crawling, sometimes
> I can feel them, it disappears.  I see shadows.

(Tr. 519-20.)  When describing her mental health concerns, Dr. Ward noted that Ms. Harrison

"cited problems suggestive of bipolar disorder, traumatic re-experiencing and psychosis."  (Tr.

520.)  He itemized numerous reported depressive symptoms, anxiety symptoms, periodic

symptoms suggestive of bipolar disorder, and symptoms suggestive of traumatic re-experiencing.

(Tr. 521.)  He noted that she denied current suicidal or homicidal ideation, plan or intent, but

reported a history of difficulty with suicidal ideation.  (*Id*.)  He also noted that she expressed

issues with perceptual disturbances, including auditory and visual hallucinations. (*Id*.)

Ms. Harrison reported a history of physical abuse by her mother, learning and discipline

problems while in school, and misdemeanor offenses including assault, domestic violence, and

disorderly conduct.  (Tr. 520.)   She also reported a less than a ninth-grade education.  (*Id*.)  She

reported currently receiving counseling services through her primary care office's clinic.  (Tr.

521.)  She also reported having been treated by mental health professionals in the past but "not

recently," and being hospitalized many years before for mental health issues, stating she was at

Netcare on two occasions because the police took her there when she threatened herself.  (*Id*.)

She reported a limited work history where she held jobs only briefly.  (Tr. 521.)  She said

the longest job she held lasted about one month, and reported having been terminated from past

jobs due to performance problems and missing work.  (*Id*.)  She reported the following work

limitations: concentrating, bending, conflicts with supervisors and coworkers, frustration

tolerance with customers, standing for long periods, and managing work pace.  (*Id*.)

Ms. Harrison reported living with three of her children and a minor grandson.  (Tr. 521.)

She described regular contact with family and periodic in-person contact with one friend.  (Tr.

521-22.)  She enjoyed cooking and listening to music, was able to drive, and reported no issues

preparing meals.  (Tr. 521.) However, she reported letting her hygiene lapse due to limited

motivation.  (*Id*.)  She also reported problems completing chores due to physical limitations and

lack of motivation, problems going shopping due to "frustration tolerance," and needing

assistance from her daughter on medication management due to forgetfulness.  (*Id*.)

She drove to her consultative examination and appeared on time.  (Tr. 522.)  She was

cooperative, and rapport was adequately established.  (*Id*.)  She was dressed informally, appeared

slovenly, and showed below average grooming and hygiene based on her unkempt hair.  (*Id*.)

She ambulated with difficulty and appeared to be in physical discomfort when attempting to sit

or stand.  (*Id*.)  Her speech was normal; she did not exhibit loose associations, flight of ideas, or

delusional beliefs; and her level of understanding was adequate without the need for rephrasing

of questions.  (*Id*.)  She appeared agitated and emotionally overwhelmed, and her facial

expression was mainly downcast, but she maintained adequate eye contact throughout the

evaluation and exhibited adequate energy to complete the evaluation process.  (*Id*.)  She

exhibited indications of anxiety as shown by tense vocalizations.  (*Id*.)  She did not exhibit

indications of obsessions, compulsions, delusions, or hallucinations, and did not show excessive

complaints of fatigue or pain.  (*Id*.)  She was alert and oriented to person, place, time, and

situation and was able to follow the conversation without significant difficulty.  (*Id*.)  Her

judgment was sufficient for her to make decisions regarding her future and manage her own living arrangements adequately.  (*Id*.)

Upon examination of her sensorium and cognitive functioning, she was able to recall personal historic information without significant difficulty.  (Tr. 522.)  She could recall five digits forward, three digits backward, and two out of three words after a brief delay.  (*Id*.)  She reported an inability to count backward from one hundred by seven in thirty seconds.  (*Id*.)  She counted backward from twenty by three, performing five iterations with one error in twenty-five seconds.  (*Id*.)  She could calculate basic math values such as "12-5" and six quarters but she could not calculate "24/3" or one quarter of 200.  (*Id*.)  She could accurately describe the similarity between steam and fog.  (*Id*.)  Dr. Ward found that her level of intellectual functioning fell within normal range, although she struggled with math.  (*Id*.)  He also found that there were no apparent deficits that would affect her ability to manage funds.  (Tr. 523.)

Dr. Ward diagnosed Ms. Harrison with bipolar I disorder, unspecified, with psychotic features, and unspecific trauma related disorder.  (*Id*.)  With respect to his functional assessment of Ms. Harrison's abilities, Dr. Ward offered the following opinions:

> **What is your assessment of the claimant's abilities and limitations in understanding, carrying out and remembering instructions, both one-step and complex?**
>
> The claimant's performance on a brief word reasoning task was not suggestive of difficulty understanding instructions. Her performance on a brief short term memory task was not suggestive of difficulty remembering instructions. She did not have difficulty understanding and responding to questions posed during the examination today. She did not report problems learning work tasks although work duties have been primarily manual and more simplistic in nature.
>
> **What is your assessment of the claimant's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace?**

Ms. Harrison was able to follow the conversation during the interview and did not ask for regular repetition of questions[.] She had difficulty completing tasks assessing attention during the evaluation which suggests difficulty with concentration and focus. Her level of energy, persistence and pace were adequate during the evaluation. She reported a history of problems with concentration in work settings which negatively affected completion of work duties.

**What is your assessment of the claimant's abilities and limitations in maintaining effective social interaction on a consistent and independent basis, with supervisors, coworkers, and the public?**

Ms. Harrison presented as agitated which may impact interpersonal interaction in work settings including limited or negative social interaction. She reported problems with frustration tolerance which contributed to conflicts with others. She noted that she has experienced psychosis which has led to conflicts and legal involvement. She reported problems with conflicts in work settings.

**What is your assessment of the claimant's abilities and limitations in dealing with normal pressures in a competitive work setting?**

Ms. Harrison presented as emotionally overwhelmed when discussing current pressures which may impact her mood stability in a competitive work setting. She reported problems managing pressure in activities including shopping and chores which contributed to frustration tolerance and conflicts. Her presentation was not indicative of intellectual or cognitive limitations which would impact her ability to manage normal work pressures. She reported problems managing pressure in prior work settings which contributed to a conflict with a former supervisor.

(Tr. 523-24.)

### ii. August 27, 2019 Medical Source Statement

In the August 27, 2019, MSS, Dr. Ward offered his opinions regarding Ms. Harrison's ability to do work-related activities on a sustained basis. (Tr. 515-17.) The following rating choices were available: (1) none – absent or minimal limitations; (2) mild – slight limitation, but individual can generally function well; (3) moderate – more than a slight limitation, but the individual can still function satisfactorily; (4) marked – serious limitation with substantial loss in the ability to function effectively; and (5) extreme – major limitation with no useful ability to function. (Tr. 515.)

16

With respect to Ms. Harrison's ability to understand, remember, and carry out instructions, Dr. Ward opined that she had:

- no limitations in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions;

- mild limitations in her ability to understand and remember complex instructions and carry out complex instructions; and

- moderate limitation in her ability to make judgments on complex work-related decisions.

(Tr. 515.)  Dr. Ward commented that his assessment in this area was based on Ms. Harrison's "[c]linical presentation and described history of limitations."  (*Id.*)

With respect to Ms. Harrison's ability to interact appropriately with supervision, coworkers, and the public and respond to change in a routine work setting, Dr. Ward opined that she had:

- marked limitations in her ability to interact appropriately with the public, supervisors, and coworkers and respond appropriately to usual work situations and to changes in a routine work setting.

(Tr. 516.)  Dr. Ward noted that his assessment in this area was based on "[d]escribed history of limitations including conflicts in work settings and terminations associated with performance difficulties [and] [p]roblems with emotional instability and frustration tolerance were noted and difficulties with missed work associated in part with her emotional stability."  (*Id.*)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At the February 18, 2020, hearing, Ms. Harrison testified in response to questioning by the ALJ and her counsel.  (Tr. 42-60.)  With regard to her work history, she reported that she stopped working when she was pregnant with triplets.  (Tr. 45.)  After her triplets were born, her job was no longer available, and she did not look for other work after that time.  (Tr. 46.)  She reported being scared to look for other work because she heard voices and saw images that were not there, did not trust herself around people, and fought with people in public.  (Tr. 46-48, 57.)

She explained that she thinks people are talking about her if she hears them talking in public.  (Tr. 46, 57.)  She described being on a bus a few years earlier, thinking women were talking about her, and slapping one of them.  (Tr. 58.)  The bus driver told her to get off the bus or he would call the police.  (*Id*.)  She also described being arrested after an altercation with her daughter.  (Tr. 58-59.)  She said the police took her to jail when her daughter wanted them to take her to a hospital.  (Tr. 59.)  She reported having been held at Netcare, a mental institution that police take people to, on a few occasions, but denied ever being hospitalized in a psychiatric hospital.  (Tr. 59-60.)

Ms. Harrison reported taking medication for the prior three years to help with the voices she heard, and said it helped a little but did not completely stop the voices.  (Tr. 47-48.)  She heard voices once or twice a week when she took her medications, but heard voices constantly if she did not take her medications.  (Tr. 48.)  She saw a psychiatrist monthly for her medications, and also saw her regular physician.  (Tr. 53.)  She used to also attend counseling, but had stopped about six or seven months prior to the hearing because she did not feel it was helping.  (*Id*.)  She reported problems with her memory, explaining that she would go into the kitchen, forget what

she went in for, and have to wait a few minutes to remember.  (Tr. 48.)  She reported problems concentrating, but did not know how to provide an example.  (*Id*.)   She also reported that her medications made her groggy.  (Tr. 50-51.)

During the day, she reported spending most of her time in her room to avoid conflict with others, either watching television or sleeping.  (Tr. 48-50, 57.)  A couple of times a day, she would find herself staring at the television and forget what she was watching.  (Tr. 56-57.)  She slept a lot when she was depressed.  (Tr. 49.)  She reported being able to shower herself, but did not always take one.  (Tr. 51.)  She also reported needing help from her children with dressing because of her back pain.  (*Id*.)  She cooked all the time for her children, and knew how to clean up after cooking.  (Tr. 52.)  She also reported being able to vacuum, sweep, and mop, go to the grocery store, and do laundry, but said her children did her laundry for her.  (Tr. 52-53.)  She had a driver's license and regularly drove around her small town, but was driven to the hearing by a woman from the organization that provided her rent assistance.  (Tr. 43-44.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 60-64.)  After informing the VE that she was finding no past relevant work, the ALJ asked VE whether there would be any jobs for an individual of the same age and with the same education and vocational background as Ms. Harrison with the ability to:

> perform at the sedentary level of exertion with the following limitations. Occasionally climb ramps and stairs.  Never climb ladders, ropes, or scaffolds.
>
> The individual can tolerate occasional exposure to extreme heat, cold, and humidity, but can never be exposed to hazards such as moving machinery and unprotected heights.
>
> The individual can occasionally exercise foot controls with the right lower extremity.  The individual is limited to performing simple, routine, and repetitive tasks but not at a production rate pace.  So, for example, no assembly line work.

The individual can make simple work-related decisions.  The individual can respond appropriately to occasional interaction with supervisors and coworkers, but with no interaction -- or, I'm sorry, but with no team or tandem work with coworkers.

And no interaction with the general public.  The individual is limited to tolerating few changes in the work setting defined as routine job duties that remain static and are performed at a stable predictable work environment.

Any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 61-62.)  The VE responded that there would be some entry-level unskilled sedentary jobs available, including wire insulator, rotor assembler, and hand mounter.  (Tr. 62.)  The VE testified that someone who was off task more than ten percent of the time would be unable to sustain full-time entry-level unskilled work.  (*Id*.)  Also, as a general matter, the VE testified that if an individual missed more than one day of work per month, she would be unable to sustain full-time entry-level unskilled work.  (Tr. 63.)

In response to questioning from Ms. Harrison's counsel, the VE testified that competitive work would likely be precluded if an individual "had a marked limitation, and that is defined as a substantial loss in the ability to effectively function in interacting appropriately with the public, supervisors, and coworkers, and in responding appropriately to usual work situations, and to changes in a routine work setting."  (Tr. 63.)  However, the VE noted that the limitations were very limiting but not really in vocational terms so he did not know if he could "objectively answer."  (Tr. 63-64.)  Thereafter, Ms. Harrison's counsel declined the ALJ's offer to try to frame the question in vocationally relevant terms.  (Tr. 64.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her March 3, 2020 decision, the ALJ made the following findings:[2]

1.    The claimant has not engaged in substantial gainful activity since May 8, 2018, the application date. (Tr. 18.)

2.    The claimant has the following severe impairments: unspecified bipolar disorder; post-traumatic stress disorder; schizoaffective disorder; explosive personality disorder; attention deficit hyperactivity disorder; degenerative disc disease of the cervical spine; and mild patellofemoral joint arthrosis of the right knee.  (Tr. 18.)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 19-22.)

4.    The claimant has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except she can: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; can tolerate occasional exposure to extreme heat, cold and humidity; can occasionally exercise foot controls with the right lower extremity; and never be exposed to hazards such as moving machinery and unprotected heights. She can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work). She can make simple, work-related decisions and can respond appropriately to occasional interaction with supervisors and co-workers but with no team or tandem work with co-workers and no interaction with the general public. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in stable, predictable work environment any necessary changes need to occur infrequently and be adequately and easily explained. (Tr. 22-28.)

5.    The claimant has no past relevant work. (Tr. 28.)

6.    The claimant was born in 1970 and was 47 years old, defined as a younger individual age 45-49, on the date the application was filed.  (*Id.*)

---

[2] The ALJ's findings are summarized.

7.     The claimant has a limited education and can communicate in English.  (*Id*.)

8.     Transferability of job skills is not at issue.  (*Id*.)

9.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including wire insulator, rotor assembler, and hand mounter.  (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Ms. Harrison had not been under a disability, as defined in the Social Security Act, since May 8, 2018, the date the application was filed.  (Tr. 29.)

## V. Plaintiff's Arguments

Ms. Harrison argues that the ALJ failed to properly evaluate the opinion of consultative psychological examiner Dr. Ward.  (ECF Doc. 14 pp. 2, 8-14.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence, or even a preponderance of evidence, supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).

**B.** **Assignment of Error: Whether ALJ Erred in Evaluating Opinion of Dr. Ward**

Ms. Harrison contends that the ALJ erred in her evaluation of Dr. Ward's opinions, arguing that the ALJ's finding that Dr. Ward's opinions were "generally unpersuasive" was not supported by substantial evidence or sufficiently explained to allow for review of the decision. (ECF Doc. 14 pp. 10-14.)  In so arguing, she notes that Dr. Ward is a mental health specialist who was hired by Social Security.  (ECF Doc. 14, p. 10.)

Since Ms. Harrison's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to her claim.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.  The five categories of evidence to be considered under these regulations include: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 416.913(a)(1)-(5).

Distinct from a prior framework that gave more weight to opinions from treating sources, the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-CV-01958-BR, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical

opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors to be evaluated are supportability, consistency, relationship with the claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration. 20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2). While ALJs are required to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b)(2). The elements of this analysis are addressed below.

### 1.    Whether ALJ Properly Considered Supportability of Dr. Ward's Opinions

As required by the regulations, the ALJ considered supportability – i.e., the extent to which Dr. Ward's own "objective medical evidence and supporting explanations" supported his opinions under 20 C.F.R. § 416.920c(c)(1) – in assessing whether Dr. Ward's findings supported the marked limitations identified in his opinions. (Tr. 26.)   In particular, the ALJ discussed supportability as follows:

> The undersigned finds Dr. Ward's mental opinion is generally unpersuasive because his own examination findings do not support marked limitation interacting appropriately with the public, supervisors, and coworkers, marked limitation responding appropriately to usual work situation, as well as marked limitations making judgments on complex work-related decisions (11F/1). As detailed herein, Dr. Ward was able to establish adequate rapport and she did not manifest any indications of obsessions, delusions, or hallucinations, and she was able to track the conversation without significant difficulty and appeared to maintain sufficient evidence to make decisions affecting her future and to conduct her living arrangements appropriately.

(Tr. 26 (citing Tr. 515).)  In her discussion of the opinion, the ALJ also acknowledged:

> At the time of her evaluation, Dr. Ward noted the claimant was dressed informally, appeared slovenly, and had below average hygiene and grooming (11F/8). The claimant presented as agitated and emotionally overwhelmed (11F/8).

(Tr. 26 (citing Tr. 522).)

Ms. Harrison argues that the ALJ erred in finding the opinion unpersuasive because "Dr. Ward's report contained ample evidence documenting support for his opinions, and the ALJ's limited discussion of Dr. Ward's objective clinical findings led to the improper decision to find Dr. Ward's opinions less persuasive." (ECF Doc. 14 pp. 10-11.) In support of this argument, she cites primarily to Dr. Ward's detailed discussion of Ms. Harrison's self-reported history and limitations. (*Id.* at pp. 11-12.) The only objective findings cited by Ms. Harrison in support of this argument are her presentation on examination as agitated, emotionally overwhelmed, downcast, and anxious, and her difficulty completing serial 7's and serial 3's. (*Id.* at p. 12.)

Effectively, Ms. Harrison argues that the supportability factor weighs in favor of persuasiveness in large part because Dr. Ward's opinions regarding marked limitations were supported by his "supporting explanations" (including his descriptions of Ms. Harrison's reported history and limitations), while the ALJ found supportability weighed against persuasiveness because Dr. Ward's "own examination findings" (i.e., objective clinical findings on examination) did not support marked limitations. While Dr. Ward's "objective medical evidence and supporting explanations" are both relevant to a supportability analysis under 20 C.F.R. § 416.920c(c)(1), the regulations do not dictate how an ALJ should weigh apparent conflicts between supporting explanations and objective medical evidence.

In this context, it must be noted that a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Rather, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at

406.  Further, the Court must consider the ALJ's decision as a whole, as well as other evidence

of record, in determining whether a finding is supported by substantial evidence. *See Heston v.*

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the

[Commissioner's] findings must be based on the record as a whole."); *Jones v. Comm'r of Soc.*

*Sec.*, No. 1:10-CV-2590, 2012 WL727737, at *23 (N.D. Ohio Mar. 6, 2012) (finding ALJ's

decision is to be read as a whole, and need not repeat findings that have already been discussed).

     Upon a review of the decision as a whole, it is evident that the ALJ's consideration of Dr.

Ward's opinions and findings was not limited to the specific findings quoted above.  When

detailing the medical evidence of record in her decision, the ALJ discussed Dr. Ward's

evaluation and findings at length, specifically noting that Dr. Ward: "observed the claimant

recalled five digits forward, three digits backward and two out of three words after a brief delay .

. . [s]he was able to accurately calculate basic math values including 12 – 5 and six quarters . . .

[s]he was able to accurately describe how steam and fog were similar"; "estimated that her

intellectual functioning appeared to fall within normal limits, though she struggled with math";

"stated her judgement was sufficient for her to make decision affecting her future and to conduct

her own living arrangements adequately"; "described the claimant as cooperative and she was

able to adequately establish rapport"; "observed the claimant put forth adequate effort during the

psychological consultative examination . . . [s]he was alert, responsive, oriented [to] time,

person, place, and event, and able to track the conversation during the consultative examination

without significant difficulty . . .  [and] [t]he claimant did not ask for regular repetition of

questions and her level of energy, persistence, and pace[] were adequate"; (Tr. 20-21 (citing 11F

(Tr. 515-524)).)   The ALJ further discussed Dr. Ward's clinical findings, noting:

> Dr. Ward observed the claimant did not display loos[e] associations, flight of ideas,
> or delusional beliefs, though she presented as agitated and emotionally …

overwhelmed (11F/8). She manifested no indications of obsessions, compulsions, delusions, or hallucinations and she did not display excessive complaints of fatigability or pain (11F/8). Dr. Ward observed the claimant maintained adequate eye contact and adequate energy to complete the evaluation process and her level of understanding was adequate, as he did not have to rephrase questions (11F/8).

(Tr. 25 (citing Tr. 522).)

The decision as a whole also recognized various elements of the self-reported history and limitations that were considered by Dr. Ward. For example, the ALJ noted Ms. Harrison's testimony that she was never psychiatrically hospitalized, but was kept for observation for 24 hours. (Tr. 25-26.) The ALJ also noted her testimony that she was "unable to work due to her inability to interact with other people," and that she had expressed concerns to Dr. Ward regarding "conflict with supervisors and co-workers and frustration tolerance with customers" and "managing work pace." (Tr. 20-21 (citing Tr. 521).) The ALJ explicitly considered Ms. Harrison's limited education and work history (Tr. 20, 23) and reported hallucinations, including their alleged severity and frequency, both with and without medication (Tr. 23, 24, 25, 26).

In this context, Ms. Harrison's argument that the ALJ took a "narrow view" of Dr. Ward's report that led to "a mischaracterization of Dr. Ward's findings" is not well supported. (ECF Doc. 14 p. 10.) As discussed above, the ALJ explicitly considered Dr. Ward's objective clinical findings in making her determination regarding supportability. Certainly Ms. Harrison has not identified material clinical findings that were ignored or mischaracterized by the ALJ. It is also evident, as discussed above, that the ALJ reviewed and considered testimony and reports by Ms. Harrison regarding her education and work history, hallucinations, and various concerns regarding her ability to function in a work environment. While the ALJ did not explicitly discuss all of the history and limitations Ms. Harrison reported to Dr. Ward, it is well-recognized that an ALJ is not obligated to discuss every piece of evidence, so long as she considers the evidence as

a whole and reaches a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x

195, 199 (6th Cir. 2010 (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th

Cir. 2006) (per curiam)).

Ultimately, the record reflects that the ALJ considered Dr. Ward's opinion that Ms.

Harrison had marked limitations in the ability to interact and respond to changes in the work

setting, without ignoring or misrepresenting material evidence, and concluded that his objective

findings were not consistent with a marked level of limitation.  It is noted that the factors Dr.

Ward identified as the basis for his finding of marked limitations did not specifically reference

his objective findings, instead focusing primarily on Ms. Harrison's self-reported history and

limitations, as follows:

> Described history of limitations including conflicts in work settings and
> terminations associated with performance difficulties.  Problems with emotional
> instability and frustration tolerance were noted and difficulties with missed work
> associated in part with her emotional stability.

(Tr. 516.)  In other words, Dr. Ward based his opinion in large part on Ms. Harrison's self-

reported difficulties in the work setting, while the ALJ reviewed the record and concluded that

the described level of limitation was not consistent with Dr. Ward's actual clinical findings at the

consultative examination.  The ALJ's conclusion was adequately supported by evidence in the

record, and her reasoning was sufficiently articulated.

Ms. Harrison argues that Dr. Ward's objective findings and supporting explanations

support a finding that his opinions as to Ms. Harrison's marked limitations were persuasive.

However, the question before this Court is not whether Ms. Harrison's preferred findings are

supported by substantial evidence.  Instead, this Court must recognize the "zone of choice"

afforded to ALJs' decisions, and consider only whether substantial evidence supported the ALJ's

finding that the "supportability" factor weighed against finding Dr. Ward's opinion to be

persuasive in this case.  For the reasons discussed above, the undersigned concludes that substantial evidence supports the ALJ's findings as to supportability.

### 2.  Whether ALJ Properly Considered Consistency of Dr. Ward's Opinions

The ALJ also considered consistency – i.e., whether Dr. Ward's opinions were consistent "with the evidence from other medical sources and nonmedical sources" under 20 C.F.R. § 416.920c(c)(2) – in assessing whether Dr. Ward's opinion as to marked limitations was consistent with other evidence in the record.  The ALJ discussed consistency as follows:

> Dr. Ward's conclusions are not consistent with the totality of the evidence, including the claimant's treatment history.  At the time of her evaluation, Dr. Ward noted the claimant was dressed informally, appeared slovenly, and had below average hygiene and grooming (11F/8).  The claimant presented as agitated and emotionally overwhelmed (11F/8).  This was generally consistent with the claimant's reports that she was experiencing more stress and anxiety because she had lost her housing and was living in her van and facing investigation with Child Protective Services (13F/2).

> However, aside from the claimant's increased situational stressors at that time, Dr. Ward's conclusions regarding her marked limitations are not consistent with the claimant's own reports and the observations of the claimant's treating providers as chronicled in her treatment notes.  The claimant reported that she was doing well on her current medications and she denied having any new stressors (2F/11 and 13F/6, dated September 9, 2019). The claimant reported to Ms. Mauer that she still heard voices and saw shadows, but they were not bad and she reported no issues (13F/6).  Further, her treating providers described the claimant as being in good spirits or she denied having thoughts of self-harm or thoughts of harming others (2F/6, and 9F/18, 21, 22, 23, 26, and 28).

(Tr. 26-27 (citing Tr. 334, 339, 464, 467-69, 472, 474, 522, 608, 612).)

Ms. Harrison argues that the evidence contradicts the ALJ's conclusion that Dr. Ward's opinions were not consistent with the balance of the treatment history, and further contends that the ALJ's focus on "situational stressors" inaccurately implies that her "mental health condition was typically less intense than it was during Dr. Ward's examination."  (ECF Doc. 14 p. 13.)  In support of this argument, she points to medical records from April and May 2019, several

months before the August 2019 consultative examination, which reference complaints of
worsening hallucinations.  (*Id.* (citing Tr. 494, 496, 503).)  She also highlights a treatment record
from a few months after the consultative examination where Ms. Harrison reported continued
hallucinations despite medications.  (*Id.* (citing Tr. 608).)

A review of the evidence cited by the ALJ in the above analysis reveals the following:

- In March 2018, Ms. Harrison reported greatly improved mood, no suicidal thoughts, better sleep, and more energy/motivation since starting behavioral health medications, with improved mood on examination, but no change yet regarding auditory hallucinations since starting Geodon, and otherwise normal mental status findings. (Tr. 339.)

- In June 2018, Ms. Harrison reported stable symptoms when taking medications regularly, with a normal mental status examination, except she reported she "still sees 'shadows' at times but stated it is manageable when taking [G]eodon." (Tr. 334.)

- At case management sessions in June and July 2018, Ms. Harrison presented in good spirits and denied thoughts of hurting herself or others. (Tr. 464, 467-69.)

- At counseling sessions in August and September 2018, Ms. Harrison presented in fair spirits with a normal mental status examination.  (Tr. 472, 474.)

- In May 2019, Ms. Harrison reported increased stress and anxiety due to living in her van still, lost her medications after only taking Geodon for a few days, and reported visual and auditory hallucinations (without commands), and had thoughts that her kids would be better off without her (but knew that they wouldn't and would never do anything).  (Tr. 608 (5/7/19 recheck notes listed in 11/22/19 office visit).)

- At her consultative examination in August 2019, Ms. Harrison presented as unkempt, agitated, anxious, and emotionally overwhelmed, but was cooperative, rapport was easily established, and her speech was normal; her intelligence was estimated as average, but she had difficulty with serial 7's and 3's.  (Tr. 522.)

- In September 2019, Ms. Harrison reported medications were going okay, that she still heard voices and saw shadows "but not as bad" and "manageable," and denied new stressors and said she did not want an increased dose or additional medication.  (Tr. 612.)

- In November 2019, Ms. Harrison reported being out of Depakote for two weeks and said she "felt more manic since being off her medications," but "report[ed] overall they are working well for her, does have some hallucinations at times however are mild and is able to notice them."  (Tr. 608.)

The evidence cited is consistent with the ALJ's characterization of the evidence, reflecting improvement of symptoms with treatment in 2018, when Ms. Harrison presented in "good" or "fair" spirits, had largely normal mental status examinations, and reported her hallucinations to be "manageable" with medications.  (Tr. 334, 339, 464, 467-69, 472, 474.)  The evidence cited is also consistent with the ALJ's discussion of situational stressors in 2019, with reports of stabilization and improved symptoms when she was on her medications.  (Tr. 522, 608, 612.)

In this context, Ms. Harrison's reference to treatment records from April and May of 2019 (*see* ECF Doc. 14 p. 13 (citing Tr. 494, 496, 503, 521, 608)) remains consistent with the ALJ's analysis, which specifically recognized the impact of situational stressors such as homelessness on Ms. Harrison's mental health symptoms at that time (Tr. 26-27).  In the April 2019 treatment record, Ms. Harrison reported a worsening in her symptoms since being homeless for two months.  (Tr. 503.)  In the May 2019 record, Ms. Harrison reported that her hallucinations had worsened since she accidentally left her medications in a hotel room.  (Tr. 494.)  At that visit, Dr. Cramer encouraged Ms. Harrison to take her medication and reinforced with her that she reported her symptoms were much improved when she was taking her medication.  (*Id.*)  Ms. Harrison's additional reference to records from November 2019 is also consistent with the ALJ's findings, as this was a record cited and relied upon by the ALJ, as discussed above.  (Tr. 608.)

Ms. Harrison also argues that "[t]he ALJ tries to make it appear as if Ms. Harrison is no danger to herself," when "the record is rife with references to self-harm and Ms. Harrison stating once that she will not hurt herself does not nullify years of contrary medical evidence."  (ECF Doc. 14 pp. 13-14.)  As noted above, the ALJ accurately cited to behavioral health, case management, and counseling records where Ms. Harrison repeatedly denied thoughts of self-

33

harm or hurting others.  (Tr. 27 (citing Tr. 334 (6/19/18 behavioral health visit), 464 (6/27/18 case management), 467 (7/12/18 case management), 468 (7/19/18 case management), 469 (7/25/18 case management), 472 (8/8/18 therapy), 474 (9/6/18 therapy).)  These are by no means the only instances in which Ms. Harrison made such denials.  (*See, e.g.,* Tr. 456, 458, 459, 461, 470, 471, 494, 609.)

Nevertheless, there is also some substance to Ms. Harrison's assertion that the record reflects a history of thoughts of death or self-harm.  (ECF Doc. 14 pp. 13-14 (citing Tr. 503, 521).)  At an April 2019 office visit, she reported thoughts of wishing she were dead so that she would not have to deal with the stress of being homeless, but clarified that "she would never actually harm herself," and denied suicidal thoughts, plan, intent, or means.  (Tr. 503.)  At her consultative examination in August 2019, she cited a history of difficulty with suicide ideation and described being taken to Netcare by police twice when she threatened herself, but also reported no current suicide/homicide ideation, plan, or intent.  (Tr. 521.)

The question thus becomes whether the ALJ's consistency analysis mischaracterized the evidence relating to this issue.  The undersigned concludes that it did not.  The ALJ's decision explicitly acknowledged Ms. Harrison's testimony that she had never been psychiatrically hospitalized but had been kept for observation for 24 hours.  (Tr. 25-26 (citing testimony).)  She also implicitly recognized this history when she noted Ms. Harrison's denial of suicidal thoughts since starting medications with Dr. Cramer (Tr. 24 (citing Tr. 339)) and when she pointed to Ms. Harrison's denial of thoughts of self-harm as evidence that her medications were relatively effective in controlling her symptoms and that her mental limitations were consistent with her residual functional capacity (Tr. 25 (citing Tr. 334, 464, 467, 468, 469, 472, 474, 613)).  Ultimately, as discussed above, the ALJ was not obligated to discuss every piece of evidence, so

long as she considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley*, 397 F. App'x at 199.   Dr. Ward did not explicitly rely on Ms. Harrison's reported history of suicidal thoughts or thoughts of self-harm as a basis for his finding of marked limitations, and it is evident that the ALJ did not mischaracterize or cherry pick the records relating to this issue.

For all of the reasons discussed above, the undersigned concludes that the ALJ did not ignore or mischaracterize evidence in support of her consistency findings, and that the ALJ was supported by substantial evidence in finding Dr. Ward's opinions regarding marked limitations were not consistent with the record as a whole.

### 3.       Whether ALJ Properly Considered Other Factors

While supportability and consistency are the most important factors for consideration in assessing the persuasiveness of a medical opinion, the ALJ may also consider the provider's relationship with the claimant, specialization, and other factors.  *See* 20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2).  The ALJ may also explain how she considered those additional factors when articulating her findings regarding persuasiveness, but is not required to do so.  *See* 20 C.F.R. § 416.920c(b)(2).

Here, Ms. Harrison notes that Dr. Ward "is a licensed psychologist and as such is an expert in mental health treatment," and that he "is also considered a highly qualified medical source who is also an expert in the evaluation of medical issues in disability claims under the Act."  (ECF Doc. 14 p. 10 (citing 20 C.F.R. § 416.920c(c)(4) and SSR 17-2p).)  While these are certainly facts that the ALJ was permitted to consider and discuss in support of her assessment of Dr. Ward's opinion, the regulations are clear that she did not err in failing to discuss these issues. *See* 20 C.F.R. § 416.920c(a) (establishing that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [a claimant's] medical sources"); 20

C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how

we consider medical opinions and prior administrative medical findings in your case record.").

Ms. Harrison also argues that "[t]he ALJ's evaluation of Dr. Ward's expert opinions

ultimately left the ALJ's decision unreviewable" because "the ALJ failed to properly connect the

dots." (ECF Doc. 14 p. 14.) Ms. Harrison is correct that error may be found where an ALJ's

reasoning does not "build an accurate and logical bridge between the evidence and the result."

*Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78

F.3d 305, 307 (7th Cir. 1996)). Nevertheless, for the reasons discussed at length above, the

undersigned finds that the ALJ's analysis in support of her finding that Dr. Ward's opinion as to

marked limitations were "generally unpersuasive" was logical, clearly articulated, based on an

accurate description of the evidentiary record, and supported by substantial evidence.

In making this finding, the undersigned notes that the ALJ did not wholly discount Ms.

Harrison's mental impairments or fail to account for her mental limitations in the RFC. Indeed,

the ALJ explained:

> While the record does not demonstrate that her mental impairments limit her so
> significantly that she would not be able to perform work at a competitive level, the
> unskilled non-exertional limitations take into account the benign objective findings,
> but generously accounts for the claimant's subjective complaints. Considering her
> bipolar disorder, post-traumatic stress disorder, schizoaffective disorder, explosive
> personality disorder, and attention deficit hyperactivity disorder (ADHD), the
> claimant is limited to simple, routine, and repetitive tasks, at no production rate
> pace. She is limited to work where she can make simple, work related decision,
> respond appropriately to occasional interaction with supervisors and co-workers
> and no team or tandem work with co-workers and no interaction with the general
> public. Given her concerns about being around other people, the claimant to limited
> to tolerating few changes in the work setting, defined as routine job duties that
> remain static and are performed in a stable, predictable work environment and any
> necessary changes need to occur infrequently and be adequately and easily

explained. In view of all of the factors discussed above, the limitations on the claimant's capacities, which were described earlier in this decision are considered warranted, but no greater or additional limitations are justified.

(Tr. 26-27.)

For all of the reasons articulated herein, the undersigned concludes that Ms. Harrison has failed to meet her burden at Step Four to demonstrate that the ALJ's well-reasoned findings regarding the persuasiveness of Dr. Ward's medical opinion constituted reversible error.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

February 9, 2022
_/s/ Amanda M. Knapp_
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _See Berkshire v. Dahl_, 928 F.3d 520, 530 (6th Cir. 2019); _see also Thomas v. Arn_, 474 U.S. 140 (1985).